16, 1488 Parkshore Estates Nursing & Rehabilitation Center v. John Mellon Council, you may proceed. Thank you. Chris Gilbert on behalf of Parkshore Estates. Your Honor, we're asking this Court to reverse the Permanent Total Disability Award rendered by the Commission and to remand this case for a redetermination of permanency. There are two issues that we want to stress from our briefs, two main issues. First of all, we want to talk about whether the petitioner established that he was actually in the on-law category. And second, assuming that he did, we want to discuss the issue of whether or not the employer met its burden demonstrating and offering that work was available for a person within his restriction. We think in this case, when we look at the first issue, it really involves two aspects for the petitioner to establish the on-law category. He has to show either a self-guided job search that was diligent but unsuccessful, or he has to present testimony that indicates that there's no stable or continuous job market available for someone in his condition. And here, I think they're trying to accomplish this through both manners, and I think both are faulty. And if we start with the job search, when we look at the Hunter case, the Illinois Supreme Court has told us over and over that it does not favor a self-guided job search. It prefers to have some type of professional assistance. Nevertheless, you'd have to admit, Mr. Elworthy, there's no case law that says that a self-directed job search is inherently unreliable or not admissible, correct? No, that's correct. That's correct. But I think the Supreme Court's caution in the Hunter court case is manifesting itself here. When we look at the records that show the job search that this gentleman undertook, it's just a blanket effort to throw out applications in hoping that he'll find something. The thing that's missing here, and I think this is the key, remember, this is petitioner's burden. While he demonstrates or he presents hundreds of alleged attempts to find employment, he never establishes that these employers were seeking employees or that work was available for someone within his restriction. As a matter of fact, I think we pointed out in our brief that there were 79 of these locations that were not even seeking employees. So I think when we look at this, even though he offered these documents to show the job search, I think it's clear that they lack substance. There's no real indication that this was a targeted search for somebody looking for employment with his restrictions. Who's Tribolt or Tribolt? Tribolt was a locational counselor, a locational assessment individual that they offered to offer some opinions about whether or not this gentleman would be, whether or not there would be stable or continuous work available for somebody in his condition. Did he opine that having a review claim in the job search, the expert felt that the search logs reflected a diligent search for employment? Was that the opinion? Well, the commission says that he did render that opinion, but when we look at Dr. Mr. Tribolt's opinions, honestly, I think that these opinions are not worth the paper that the testimony was written on or his report. Well, you know what our response is going to be to that. Well, I mean, you're going to say this is a manifest way, and certainly it is. And the credibility and weight goes to the commission, right? Right. But in certain instances, when a doctor or when a witness or when an expert such as this, opinions are so lacking in the substance, you've also shown a willingness to go behind the opinion and say there's no basis or substance for this opinion. And when we look at Tribolt and we say he never conducted any testing, he didn't make any attempts whatsoever to try to find this gentleman work, he didn't assist him with his job search in any type of vocational training, he didn't talk about how to improve himself, he didn't evaluate what the petitioner was capable of, he didn't contact the petitioner's employer or his physician. And I think this is the key. This is the key for a vote person who does not perform any of that background to then say that he found the statement in the FCE that the petitioner could only work seven hours a full day to be dispositive of his opinion. I mean, he makes the comment at 264, he says this is probably the easiest sentence that I've ever had to write because the FCE said he can't perform full-time work, so he can't perform full-time work. Well, the inability to work an eight-hour day, if you can work a seven-hour day, you're not a productive person in the workforce. There's not regular and continuous work. I noticed from the record, though, that the petitioner had a vocational expert testify. The respondent didn't. That's true, but that doesn't mean that we can't diminish the opinion. Well, you can attack it if you want, but the problem is it's the only one in the record. That is true. And he did opine that based upon the man's age, training, education, experience and condition, he was not able to engage in a stable and continuous employment. He said it. And he said he didn't have a GED, couldn't work over seven hours, wasn't able to do heavy work. Then the next question that I have is if you accept tribal's opinion that the man is not capable of employment within a job market, is there any evidence in the record from the respondent that he is? Yes, and I'll answer that, and then I'll go back to your comment about tribal. If this Court were to assume that the diligent but unsuccessful job search holds water and you adopt it. That's a possibility. If you do, if you adopt the testimony of Mr. Trialor, then the burden switches to the employer to show that work was available. And I think that's when we get into the other issue, the main issue that I want to focus on. Was his job offer a sham? And when we look at the law, the two cases that we presented in court, Reliance and the LFA systems outline, we see that the job offer in this case is nothing like the job offers in those cases. And I think they're distinguishable. As a matter of fact, when we look at Reliance, we see a finding that the job offer was a sham based on the fact that it was not offered until after the first arbitration. The rate of compensation was higher than was deemed to be feasible. There was a repeated refusal by the employer to offer the employment. And the company records, I think this is important, the company records in that case indicated there was no intent to bring the petitioner back to work. Likewise, when we look at Yellow Freight, again, they concluded that it was a sham, but they did so because they said the claimant was clearly not qualified to do the job. He didn't have the requisite educational level. The employer had only said there are three job openings, but it did not actually offer any of those jobs to the petitioner. So we have nothing in this case that would compare to Reliance or Yellow Freight factors. They're just simply not present. Well, what about this? Claimant testified the position offered by the employer of assistant maintenance supervisor never existed in the 10 years he worked for the employer. Is that true? I don't think that makes any difference, Your Honor. First of all, we have a job offer of a position that's available, and when we looked at the affidavit of Tamika Brown, she clearly said this was a job that was created to accommodate this individual. And when we look at the factors, again, we have a job that he's familiar with, the job duties. We have a reasonable salary. Times change from the time that this gentleman was injured to the time that he was attempted to be brought back. What type of work was he to do in that position? The offer, when you look at the offer letter, it doesn't specify other than beyond your title would be assistant maintenance director. So there's really no breakdown of what the job duties would be, Your Honor. Can we tell what type of work he was expected to do based on what type of work the department had done in the past and what positions there were and which ones were filled? In other words, there's a position being created here, but to do what? And is it incumbent on the employer to identify what that position entails? Well, I think the fact in this case, no, there's nothing that explains that. There's nothing that provides any further detail than that, the actual letter itself. But I think the fact that it's an assistant maintenance director position and he clearly is familiar with a maintenance director position, and he knows the type of work, given the fact that the employer is aware of the restrictions, I think we can safely assume that these would be activities that would be well within his restrictions. But I think the thing about this offer that bothered us when we looked at this is that here we have an offer communicated to the petitioner's counsel roughly a week before the arbitration, and it doesn't appear that it was given to the petitioner until at the time of arbitration. And he's asked, the petitioner has asked at the hearing, had you known about this letter prior to the arbitration, would you have called an employer? What would you have done about it? And he says, I think I'd probably would have called them. So we have a gentleman who's indicated on the record a willingness to work, a willingness to try to go back to his old employer and resume a job similar to his prior job, but the arbitrator and the commission just wholly dismiss that. And I think the fact, when we look at what the purpose of the COMP Act is, you know, they always talk about we want to return the person to work. We just don't want to give them a lump of money. We want to take a person who's been injured and bring them back and put them back into a job so that they're productive. We've got a 42-year-old gentleman here with light duty restrictions, 20-pound weight restriction, and he's been offered an opportunity to go back to work. At what point was he given that offer? Well, the letter itself is dated June 26th. There was an e-mail that was forwarded to his attorney, I believe the record says on July 2nd, and the arbitration I believe was on July 9th, so roughly about a week. What's the ostensible reason why he was given a week before the arbitration? I don't think there's anything that explains that, Your Honor. Because Tribal's report wasn't issued until May of 2014, one month prior to the issuance of the offer. And Tribal was the first one that said it was a permanent total. When did you get a copy of Tribal's report? The record doesn't indicate, Your Honor. I'm not aware of that. You know, the problem with these cases, when you talk about these job offers that come a week before the arbitration, is I know the commission looks askance at these things because if these people are denied permanent total because of this job offer, at a given point in time shortly after the case is over, you fire them. And they can't come back and ask for permanent total, can they? So now the question becomes what does the commission do to protect these people? If it's questionable, they say your offers are shams. And when the offers come one week before the arbitration, but the guy was injured on what date? He was injured in 2011. It was November 22nd. You got a man injured in 2011. And at what point in time did his treaters say he could go back to work at least in a light duty capacity? He was released to light duty in February of 2013. So between February of 2013 and June of 2014, nothing from the employer. Seven days before the arbitration, bingo, comes the offer of a job with no description. And the arbitrator says it's a shame. And the commission agrees with it. And I suppose these type of decisions come from a belief that if they're denied permanent total based on circumstances like this, they're going to get fired shortly thereafter. And they have no recourse whatsoever if you do it. Well, I think in this case there's a couple different factors to take into consideration. I know the record does show that there was a situation with the insurer for this client where there was a bankruptcy and new counsel was appointed. I would point out that when new counsel took over in May of 2014, it was roughly two months between that date and the date that this job offer came. So clearly we definitely have a change in tactics by the counsel and how they're trying to prosecute or defend this case. No question the attorneys do. But the commission isn't concerned with the way counsel is prosecuting the case. The commission's concern is what the employer is going to do with this guy after the commission issues a final order. And he no longer has any appeal rights. I understand your concerns, and I've heard you articulate those in other cases. And I think in this case, for the commission and the arbitrator to jump to the other extreme and say, well, we're just going to go ahead and fine this gentleman, 42-year-old gentleman, a permanent total, when the hearing could have been delayed, we could have had an opportunity to send him back to work to see if he's capable of doing the work, to see what he's able of. We've got the vocational consultant here giving an opinion that the gentleman can't return to any employment, but yet the FCE says he can work seven hours. No one considered a wage differential. And the case is saying we should drive towards a wage differential. And that is just completely tossed off the table here. And when you have an offer of employment, you give it some time to see if it's going to work, look at whether or not this gentleman is capable of performing some other type of work. Why didn't Tribal testify or do anything to look as to whether there are part-time jobs that this gentleman could perform and say, I found one, here's the wage, and we establish a wage? He didn't do that. That's their burden. If we're offering a job and he was able to go back and do that job, well, then it's permanent partial disability. But to jump to the other extreme, as it did here, and award a permanent total disability for this gentleman, these facts, I don't think they're warranted. This job search, it's not a valid job search. It just almost looks like somebody just went through his cell phone book and made a bunch of phone calls. And whether or not they're hiring or not doesn't really matter. Just, I made the phone calls. That's what this job search looks like. We look at Tribal. His opinion is, Kerry, no, wait. And I know credibility is obviously a matter for the Commission. But when it goes to the extreme like it does here, and there's a guy who just basically looks and says, I'm not conducting any investigation into this gentleman. I'm not doing any assessment. I'm not going to help him do anything. And I like this line that says he can only work seven hours a day and eight-hour days are work days, so he can't work. That's a bad opinion. And that opinion should not be relied upon. So it goes to a failure of their proof. And so we don't think that they even met the burden to transfer the burden to us. But even if you would find that the burden was satisfied, we do think this job offer was legitimate. It was legitimate enough to at least have this case continue to see whether the gentleman could do the job. He said he wanted to do the work. He said, I would have probably called. How can a job be a sham to a petitioner who says, I'll probably, I'd probably call and look into it? That doesn't make sense. Thank you. Thank you, Counsel. You'll have time in reply. Counsel, you may respond. Thank you. Your Honor, Counsel, my name is Dominic Machereau. I represent the Petitioner Affiliate here, John Geber. And basically jump right into it. Mr. Geber was injured in an undisputed accident in November 2011. All benefits were paid. The issues here are whether or not he had a diligent job search and whether or not he was able to return back to work. Let's jump to the offer that was made. Other than the timing, waiting until a week before the arbitration hearing, is there anything in addition to the timing that you're going to argue shows it was a sham? The facts of the job itself. And what were they that indicates that? The offer was paid. They were offering Mr. Geber the exact same pay he had as a higher-level job. They were going to bring him back as an assistant. Now, Mr. Geber testified that the time that he'd been there, there had never been an assistant in the maiden's position. However, they manufactured this job to bring him back in there as an assistant, but the same pay he had as the manager. As the current manager? Pardon me? Same pay as the current manager? Well, the same pay that he was paid when he got injured. And how many years it transpired? Between that and three years of that. Three years. Uh-huh. And so nobody got any raises in three years? They offered him $29.80 an hour, the same pay he received when he was working there as an employee. Three years ago? Correct. Yeah, my point is, is that, were there any raises in this business to the other employees in that period of time? Well, Clyde also testified, in that area, there was only the maintenance director, which was him, and two other laborers. It wasn't a large office. So they needed someone else to fill that position. I don't know what the new maintenance director was being paid, but the job they offered to Mr. Geber was for the same rate of pay that he was earning when he was injured. Yeah, I bet he wouldn't have been happy being there three years and getting that same rate of pay. Well, he had been there ten years prior. He had been in the maintenance department ten years? Yes, at that same facility. Were there any positions within the maintenance department, regardless of which positions they were, that would have fit his work restrictions? When Mr. Geber worked there, there was a maintenance director and two laborers. That was the extent of the maintenance department. Would he have been able to do either of those positions? No. They both required a higher level of work and light duty. So is an employer prohibited from creating a position within the restrictions of injured work? Absolutely not. The employer can't manufacture a position for him, but if this particular position was manufactured, did not have any idea what his actual job duties would do, they brought him back at the exact same pay. Well, I'm worried about that exact same pay because three years has transpired, and maybe people got some raises in that period of time. So, I mean, I'm not sure that's a great factor to rely on to say it's a sham. Well, also in the brief that the respondent had written, they only provided that rate of pay only to prevent a wage differential situation. They figured if they give a lower rate of pay because he had a lower-ranking job, we're going to have a wage differential issue. So let's bring him back at the same rate of pay, but we don't know what exactly he's going to do. And my client testified that prior to him leaving there with his injury, there was never an assistant to the maintenance director. Who would have to pay the wage differential? Pardon? From this work, since the vehicle bankruptcy occurred, and I guess a reservation occurred that found that the ownership of this facility had assets in excess of $25 million, it is, I guess, a personal responsibility of the company. When did the bankruptcy occur? Before or after the job offer was made? So the employer was personally on the hook, whether he went with wage differential or he went with the job. In either case, it wouldn't come out of the employer's pocket. Correct. Okay. And basically, with that job offer, we thought it was economically unjustifiable because that job could accommodate Mr. Devitt's late administration at the same rate of pay as a more skilled laborer, just to prevent the wage differential situation. What I was going to originally was Mr. Devitt's job search. Mr. Devitt has a ninth-grade education, has no GED, no transferable skills, can't drive a truck, he can't drive a forklift, he has no certifications. He worked in this maintenance job for 10 years, since he was 30. Before that, he worked with his father in the maintenance department. Before that, he worked in a bicycle shop. He has had no transferable skills. This guy came into the job, he worked the job he was trained for. He trained on the job. Now, yes, the job search he did was without a vocational rehab, but vocational rehab was demanded from the respondent prior to the attorneys changing, and he was met with no response. So at my firm's request, we asked him to start looking for work, keep track, call people around you, call the jobs in your area that you can do that are within your restrictions, keep track of them, and see if you can get hired. Who were the restrictions again? It's a lightening job. It was $87, less than $20. And there was absolutely no jobs around that were within that restriction. Correct. He was unable to find any type of work. How about McDonald's? He applied at McDonald's. He applied at all the fast food restaurants. And that was documented, right? Yes, the job search logs. No, he took his own address and just contacted them and placed it around his own address. The record shows he applied for approximately 14 months looking for jobs both online and in the community, and during that time he contacted over 300 potential employers. Is that correct? Correct. And so when he wasn't given a… If he had accepted the job offer and the case had then been settled or gone to a ward and trial, and he were fired by the employer two months after the case was finalized, would he have any rights under 19-H? He would not. Once the case would be closed as a settlement, our rights to a trial would really be at a close. Well, assume that he went to trial after accepting the job offer and the commission issued its decision. Would he have any rights under 19-H if they fired him after the decision were final? No, the decision was final. After 30 days it becomes final. No appeals are final. So he's stuck with whatever situation he'd be in  Well, he'd have some other remedies to call, but not within the Act. Not under the Workers' Compensation. He wouldn't have any remedy to go back after his employer. For installing, it could be an ADA violation. If he has restrictions, they'd take him back on restrictions. He might go file that claim, but nothing under the Workers' Compensation Act. So is it your opinion or conclusion that on the issue of a diligent job search in the SHM offer that a conclusion opposite to the one drawn by the commission is not clearly apparent? It is not clearly apparent, and it makes the math as weak. And also, in that period of time when McClain was doing the job search, he wasn't paid any benefits. There are 15 months that passed and no benefits are paid to Mr. Getty. Now, the Respondent has an idea that not only should he be doing a vocational counselor should help him with the job search, but once they refuse to help him do the job search, once demand was made for vocational rehabilitation and there was no response, then they can't come back and complain about how he did it. That's another factor that I see as important in treating the petitioner this way. He was not getting paid. He was not getting any benefits. They refuse to help him with the job search, and then when they come back later, say, oh, the job search is wrong. Basically, just like the opinion of the commission and the felon court, I mean the opinion of the arbitrator and the lower court. You're going to give us our opinion already? That's the beginning of the review. Very good. Thank you, counsel. Counsel, you may reply. My only response is the issue about the issue you raised with respect to the medical. I think that was resolved prior to the arbitration, and it's not an issue on the appeal, so it's not really a defense to throw that into the mix in this case. We're looking at whether or not the permanency award was proper, and we don't believe it was. Thank you. Thank you, counsel, both for your arguments in this matter. They will be taken under advisement.